UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| MARVEL MA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 6:11-CV-03048-RTD |
| | ) | |
| v. | ) | |
| | ) | |
| THE BOARD OF GOVERNORS OF | ) | |
| MISSOURI STATE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEENDANT MISSOURI STATE UNIVERSITY'S**
**SUGGESTIONS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Board of Governors of Missouri State University (hereafter "MSU" or the "University"), by and through its attorneys TUETH KEENEY COOPER MOHAN & JACKSTADT, P.C., pursuant to Rule 56 of the Federal Rules of Civil Procedure, and L.R. 7.0 and 56.1, and for its Memorandum in Support of its Motion for Summary Judgment states as follows:

## TABLE OF CONTENTS

STATEMENT OF UNDISPUTED MATERIAL FACTS…………………………………………5

ARGUMENT……………………………………………………………………………………15

I.    THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I BECAUSE IT WAS NOT PLAINTIFF'S EMPLOYER UNDER TITLE VII………….15

II.    THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I BECAUSE PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE……………19

III.    THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I BECAUSE PLAINTIFF LACKS SUFFICIENT EVIDENCE OF PRETEXT…………23

IV.    THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II UNDER THE DOCTRINE OF SOVEREIGN IMMUNITY……………………………27

CONCLUSION…………………………………………………………………………………30

1

## <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Adams v. Valega's Prof. Home Cleaning, Inc.*, 2012 U.S. Dist. LEXIS 157550

    (N.D. Ohio Nov. 2, 2012) ……………………………………………………………18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)…………………………………………..15

*Bone v. G4S Youth Servs., LLC*, 686 F.3d 948 (8th Cir. 2012)…………………………………25

*Braden v. County of Washington*, 2010 WL 1664895, (W.D. Pa. Apr. 23, 2010)………………18

*Calvin v. Yellow Freight Sys., Inc.*, 218 F.3d 904 (8th Cir. 2000)………………………………23

*Carpenter v. King*, 679 S.W.2d 866, 868 (Mo. banc. 1984)……………………………………..28

*Casady v. Bd. of Governors of Northeast Mo. State Univ.*, 875 S.W.2d 909 (Mo. App. 1994)…29

*Clinton's Ditch Co-op Co., Inc., v. NLRB*, 778 F.2d 132 (2d Cir. 1985),

    *cert. denied*, 479 U.S. 814 (1986) ……………………………………………………………15

*Dorlon v. City of Springfield*, 843 S.W.2d 934 (Mo. App. 1992) ………………………………27

*G. Heileman Brewing Co., Inc. v. NLRB*, 879 F.2d 1526 (7th Cir. 1989) ………………………15

*Guimaraes v. SuperValu, Inc.*, 674 F.3d 962 (8th Cir. 2012)………………………………...19-21

*Howard v. City of Kan. City*, 332 S.W.3d 772 (Mo. 2011)………………………………………...28

*Kenyatta v. Bookey Packing Co.*, 648 F.2d 552 (8th Cir. 1981)…………………………………24

*Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011 (8th Cir. 1999)………………………………...21

*Krasney v. the Curators of the Univ. of Mo.*, 765 S.W.2d 646 (Mo. App. 1989) ………………28

*Lee v. Rheem Mfg. Co.*, 432 F.3d 849 (8th Cir. 2005)…………………………………………...21

*Lovland v. Employers Mut. Cas. Co.*, 674 F.3d 806 (8th Cir. 2012)……………………………24

*Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030 (8th Cir. 2010) ……………………………24

*McDonnell Douglas v. Green*, 411 U.S. 792 (1973) ……………………………………...20-21

Case 6:11-cv-03048-BP   Document 65   Filed 09/03/13   Page 2 of 31

*Mitchem v. Edmond Transit Mgmt., Inc.*, 2012 U.S. Dist. LEXIS 86921 (W.D. Okla. 2012) ....18

*Muor v. U.S. Bank Nat'l Ass'n*, 716 F.3d 1072 (8th Cir. 2013)……………………………...21-25

*New Hampshire v. Maine,* 532 U.S. 742 (2001)……………………………………………………19

*Onyiah v. St. Cloud State Univ*., 684 F.3d 711 (8th Cir. 2012)………………………………24-25

*Reed v. Coll. of the Ouachitas*, 2012 U.S. Dist. LEXIS 56227 (W.D. Ark. Apr. 23, 2012)…….15

*Rivas v. Fed. de Asociaciones Pecuarias*, 929 F.2d 814 (1st Cir. 1991) ………………………..16

*Shah v. Littelfuse Inc.*, 2013 U.S. Dist. LEXIS 61081 (N.D. Ill. Apr. 29, 2013) ………………18

*Southers v. City of Farmington,* 263 S.W.3d 603 (Mo. 2008)…………………………………...27

*Stanback v. Best Diversified Prods., Inc.*, 180 F.3d 903 (8th Cir. 1999)………………………...26

*State ex rel. Ripley County v. Garrett*, 18 S.W.3d 504 (Mo. App. 2000)………………………..28

*Takele v. Mayo Clinic*, 576 F.3d 834 (8th Cir. 2009)…………………………………………..23, 26

*Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64 (8th Cir. 1997)……………………………..20

*Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (*en banc*),

    *cert. denied*, 132 S.Ct. 513 (2011)……………………………………………………….*passim*

*V.M.B. v. Mo. Dental Bd.*, 74 S.W.3d 836 (Mo. App. 2002) …………………………………29

*Walker v. St. Anthony's Medical Ctr.*, 881 F.2d 554 (8th Cir. 1989) …………………………...22

*Western Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7 (Mo. banc 2012)………………………27

*Wierman v. Casey's Gen. Stores*, 638 F.3d 984 (8th Cir. 2011)…………………………………25

*Wilcox v. Allstate Corp*., 2012 U.S. Dist. LEXIS 177929 (N.D. Ill. Dec. 17, 2012) …………..18

3

**Statutes:**

42 U.S.C. § 2000e-2(a)(1) ……………………………………………………………15

R.S.Mo. §105.711……………………………………………………………………29

R.S.Mo. §§ 174.020, *et seq.* ……………………………………………………27

R.S.Mo. § 213.010(7)………………………………………………………………28

R.S.Mo. § 213.011 …………………………………………………………………28

R.S.Mo. § 537.600………………………………………………………………27-29

R.S.Mo. § 537.610 …………………………………………………………………28

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**Missouri State University and Liaoning Normal University**

1.      Missouri State University ("MSU") is a Missouri public university created by the Missouri legislature.  R.S. Mo. §§ 174.020, *et seq.*

2.      MSU's Springfield, Missouri campus was founded in 1905, and the first classes were held at MSU in 1906.  Affidavit of Stephen Robinette, attached hereto as **Exhibit A** (hereafter "Robinette Aff."), ¶ 2.

3.      Today, MSU has campuses in Springfield and West Plains, Missouri.  Robinette Aff., ¶ 2.

4.      MSU serves more than 23,000 students at its two campuses.  Robinette Aff., ¶ 2.

5.      MSU is under the general control and management of the Board of Governors, which according to statutes of the state of Missouri, possesses full power and authority to adopt all needful rules and regulations for the guidance and supervision of the University.  R.S. Mo. §§174.040, 174.457.

6.      MSU is governed by a nine-member Board of Governors. All members are appointed by the Governor, with the advice and consent of the Missouri Senate.  R.S.Mo. §§174.040, 174.450, 174.453.2 and 174.455.

7.      Liaoning Normal University ("LNU") is a Chinese University located in Dalian, China.  Robinette Aff., ¶ 3.

8.      LNU is a separate legal entity from MSU and is organized pursuant to Chinese law.  Robinette Aff., ¶ 3.

9.      The management of LNU and MSU are separate.  LNU employees manage the affairs of LNU and MSU employees manage the affairs of MSU.  Robinette Aff., ¶ 4.

5

10.     LNU and MSU do not share common officers and members or their respective Boards of Directors, Trustees or Governors.  Robinette Aff., ¶ 5.

11.     The labor relations at LNU and MSU are separate and employee disputes are handled separately at LNU and MSU.  Robinette Aff., ¶ 6.

12.     The ownership of MSU and LNU are separate:  MSU is a Missouri state university and its Board of Governors is separate and distinct from LNU and its ownership/management (there are no persons who serve on both MSU's Board and on LNU's Board or management).  Robinette Aff., ¶ 7.

**LNU-MSU College of International Business**

13.     In 2003, MSU entered into a Master Agreement to collaborate with LNU with regard to the LNU-MSU College of International Business ("COIB").  Robinette Aff., ¶ 8; Master Agreement (MSU 2252-2257), attached hereto as **Exhibit B**.

14.     Despite this collaboration, MSU and LNU maintain separate operations.  LNU and MSU maintain separate bank accounts.  Though there is a bank account for the COIB, only LNU employees have access to this account.  LNU and MSU also maintain separate payroll and insurance programs and have separate personnel and administration.  Robinette Aff., ¶ 9.

15.     Students enrolled at the COIB take classes at LNU's campus in Dalian, China.  Robinette Aff., ¶ 10.

16.     Students who successfully complete their course of study at the COIB receive a degree from both MSU and LNU.  As a result, the COIB receives accreditation from United States accreditation bodies.  Robinette Aff., ¶ 10.

17.     In accordance with accreditation requirements, MSU has the authority to "approve and provide qualified instructors for agreed upon programs in accordance with

6

standards set forth by the educational governing bodies from the United States." Master Agreement; Robinette Aff., ¶ 11.

18.     All faculty in the Associate of Arts program and staff at the COIB are employees of LNU, not MSU.  Robinette Aff., ¶ 12.

19.     All faculty in the Associate of Arts program and staff at the COIB work at LNU's campus in Dalian, China.  Robinette Aff., ¶ 12.

20.     All faculty in the Associate of Arts program at the COIB who are not Chinese citizens enter into written employment agreements with LNU as "foreign experts" under Chinese law.  Robinette Aff., ¶ 12; Deposition of Marvel Ma ("Pltf. Dep."), attached hereto as **Exhibit C**, p. 21.

21.     Chinese law requires that persons employed in China at the COIB be subject to the "direction, supervision and evaluation" of LNU, not MSU.  Robinette Aff., ¶ 13.

22.     All faculty in the Associate of Arts program and staff at the COIB report to the dean and associate dean of the COIB, both of whom are LNU employees.  Robinette Aff., ¶ 14.

23.     All faculty in the Associate of Arts program and staff at the COIB are paid by LNU, not by MSU, and pay taxes to the Chinese government on their income receive from LNU. Robinette Aff., ¶ 15.

24.     MSU does not issue LNU faculty W-2's or other United States tax forms. Robinette Aff., ¶ 16.

25.     In the fall of 2009, LNU employed the following persons of Chinese ancestry as faculty members:  Bin Jun Li, Victor Chang, Grace Chen, Charlie Kong, Marvel Ma (Plaintiff), Rachen Che, Chen Xue Brooks (possibly).  Pltf. Dep., p. 61.

26.     All staff at the COIB are of Chinese ancestry.  Pltf. Dep., p. 64.

27.     The majority of students who enrolled at the COIB were of Chinese ancestry/race. Pltf. Dep., p. 62.

**Plaintiff's employment by LNU**

28.     Plaintiff has never been an employee of MSU.  Robinette Aff., ¶ 20.

29.     Plaintiff has never entered into an employment contract with MSU.  Robinette Aff., ¶ 20; Pltf. Dep., pp. 22-23.

30.     Plaintiff has never received a paycheck from MSU.  Robinette Aff., ¶ 20; Pltf. Dep., p. 63.

31.     Plaintiff has never received a W-2 form from MSU.  Robinette Aff., ¶ 20; Pltf. Dep., p. 63.

32.     Plaintiff was first employed by LNU in Dalian, China, as a non-tenured faculty member in the Associate Arts program, at the COIB in the fall of 2006.  Robinette Aff., ¶ 17; Pltf. Dep., pp. 15-16, 36-37.

33.     All classes taught by Plaintiff at the COIB were taught in China.  Robinette Aff., ¶ 18; Pltf. Dep., p. 62.

34.     On or about September 14, 2006, Plaintiff entered into a written contract, in Dalian, China with LNU for the period of between August 1, 2006, and July 31, 2007 (the "2006 Contract").  Pltf. Dep., pp. 17-18; 2006 Contract, attached hereto as **Exhibit D**.

35.     The signatory for LNU on the 2006 Contract was Guangcai Dong, Dean of the COIB ("Dean Dong").  Pltf. Dep., 17-19; 2006 Contract.

36.     Dean Dong was, at all times, an employee of LNU; Dean Dong is not now, and never has been an employee of MSU.  Robinette Aff., ¶ 19.

8

37. The 2006 Contract was a standardized form of "foreign expert" contract created by the Chinese government with regard to hiring persons to work in China. Pltf. Dep., pp. 19-20; 2006 Contract.

38. Plaintiff agreed in his 2006 Contract that the direction, supervision and evaluation of his work would be conducted by LNU. Pltf. Dep., p. 23.

39. Plaintiff entered into another "foreign expert" contract with LNU for the 2007-2008 academic year (the "2007 Contract"). Pltf. Dep., p. 24; 2007 Contract, attached hereto as **Exhibit E**.

40. The 2007 Contract was also executed by Dean Dong on behalf of LNU, and provides that the direction, supervision and evaluation of Plaintiff's work would be conducted by LNU. 2007 Contract.

41. Plaintiff entered into another "foreign expert" employment contract with LNU for the 2008-2009 academic year ("2008 Contract"). Pltf. Dep., pp. 29-30; 2008 Contract, attached hereto as **Exhibit F**.

42. The 2008 Contract was also executed by Dean Dong on behalf of LNU, and provides that the direction, supervision and evaluation of Plaintiff's work would be conducted by LNU. 2008 Contract.

43. Plaintiff entered into another "foreign expert" employment contract with LNU for the periods between August 15, 2009 – January 15, 2010, and February 15, 2010 – June 30, 2010 ("2009 Contract"). Pltf. Dep., p. 30; 2009 Contract, attached hereto as **Exhibit G**.

44. The 2009 Contract was also executed by Dean Dong on behalf of LNU, and provides that the direction, supervision and evaluation of Plaintiff's work would be conducted by LNU. 2009 Contract.

45.     Plaintiff was paid in cash in Chinese currency (Yuan) by LNU for his employment services as a faculty member at the COIB.  Pltf. Dep., p. 32.

46.     Plaintiff paid taxes to the Chinese government with regard to his employment by LNU at the COIB.  Pltf. Dep., p. 33.

**Events leading to Plaintiff's termination**

47.     Plaintiff was first informed in May or June of 2009 that he would not be offered a teaching contract for the 2009-2010 academic year by Dan Shepherd, then Associate Dean at the COIB ("Shepherd").  Pltf. Dep., p. 39-40.

48.     Shepherd was an employee of LNU pursuant to a "foreign expert" contract; Shepherd was never employed by MSU.  Robinette Aff., ¶ 21; Pltf. Dep., p. 45.

49.     Shepherd informed Plaintiff that he intended to replace Plaintiff with Joseph Cheong ("Cheong") as the instructor for the computer and information services ("CIS") classes. Pltf. Dep., pp. 39-40.

50.     Plaintiff admitted that Cheong is of Asian ancestry/race – and is possibly of Chinese ancestry/race.  Pltf. Dep., p. 41.

51.     Plaintiff sent Stephen Robinette ("Robinette"), MSU's Director of Academic Outreach and Support and Director of China Operations, an email inquiring about any possible work for the 2009-2010 academic year at the COIB.  Pltf. Dep., p. 42.

52.     Plaintiff believes that Shepherd convinced Robinette to rehire Plaintiff for the 2009-2010 academic year.  Pltf. Dep., p. 42.

53.     Plaintiff also admitted in his deposition that Shepherd was "the primary person behind my termination."  Pltf. Dep., pp. 95-96.

10

54.     Plaintiff was eventually hired in August of 2009 to teach two sections of CIS 232. Robinette Aff., ¶ 23; Pltf. Dep., pp. 36, 65-66.

55.     On October 29, 2009, Plaintiff was informed in person and in writing by Michael Coutts ("Coutts"), the Assistant Dean of the COIB, that Plaintiff's employment was being terminated.  Pltf. Dep., pp. 64-65.

56.     Coutts replaced Assistant Dean Shepherd as Assistant Dean of the COIB.  Coutts is an employee of LNU pursuant to a "foreign expert" contract; Coutts was never employed by MSU – he has never entered into any employment contract with MSU, he never received a paycheck from MSU, and he never received tax forms from MSU.  Robinette Aff., ¶ 22

57.     Plaintiff was told that he was being terminated for repeated class absences.  Pltf. Dep., p. 65.

58.     Plaintiff admitted in his deposition that "I was not there during the first two weeks" of classes.  Pltf. Dep., pp. 66-67.

59.     Plaintiff admitted that "on the first day of class, actually I was there. I did attend that class. But no students showed up, or very few showed up.  It was supposed to be, like 40 or 50 students, and I think just a few showed up."  Pltf. Dep., p. 68.

60.     It is Plaintiff's belief that Shepherd recommended, instigated and caused Plaintiff's termination.  Pltf. Dep., p. 65.

61.     Plaintiff was replaced by Joseph Cheong, a person of Chinese and/or Asian ancestry/race, who assumed Plaintiff's teaching responsibilities in the fall of 2009.  Pltf. Dep., pp. 74-75; Robinette Aff., ¶ 26.

62.     After Plaintiff was terminated, he sent a series of communications complaining about his termination, but not mentioning any claims of discrimination.  Robinette Aff., ¶ 26. These communications included the following:

a.     On December 18, 2009, Plaintiff sent an email to Robinette threatening "legal action against the school for breach of contract."  Plaintiff's communication does not make any allegations of discrimination.  December 18, 2009 email, attached hereto as **Exhibit H**; Pltf. Dep., pp. 70-71.

b.     On December 19, 2009, Plaintiff sent a six and one-half page letter to Robinette challenging his termination.  Plaintiff's communication does not make any allegations of discrimination.  December 19, 2009 letter, attached hereto as **Exhibit I**; Pltf. Dep., p. 71.

c.     On December 21, 2009, Plaintiff sent a two-page email to Robinette and others challenging his termination.  Plaintiff's communication states that Shepherd terminated Plaintiff because of his "personal dislike of me."  Plaintiff's communication does not make any allegations of discrimination.  December 21, 2009 email, attached hereto as **Exhibit J**; Pltf. Dep., p. 77.

d.     On December 24, 2009, Plaintiff communicated by email with Dean Dong about his termination.  Plaintiff's communication does not make any allegations of discrimination.  December 24, 2009 email, attached hereto as **Exhibit K**.

e.     On May 20, 2010, Plaintiff communicated by email with numerous people, including MSU administrators, LNU administrators, and various media, complaining about his termination.  Plaintiff's communication does not make any allegations of discrimination.  May 20, 2010 email, attached hereto as **Exhibit L**.

12

f.     On June 3, 2010, Plaintiff communicated in writing with the Faculty Senate at MSU complaining about his termination. Plaintiff's communication does not make any allegations of discrimination. June 3, 2010, letter, attached hereto as **Exhibit M**.

63.     Approximately one to two months after his termination, Plaintiff initiated litigation in China to recover damages due his termination. Pltf. Dep., p. 81.

64.     Plaintiff obtained a judgment against LNU in his Chinese litigation arising out of his termination. Pltf. Dep., p. 98.

**Plaintiff's allegations of discrimination**

65.     Plaintiff alleges that Shepherd made the following comments that Plaintiff believes revealed discriminatory animus:

a.     In September or October of 2009, Shepherd allegedly said something like "all you fucking Chinese people are driving me crazy" or "causing me trouble." Pltf. Dep., pp. 45-46.

b.     In February or March of 2009, Shepherd allegedly referred to "you people," when discussing another faculty member of Chinese race/national origin named Charlie Kong. Pltf. Dep., pp. 46-47.

c.     At some point in time, Shepherd allegedly said that "Chinese deans" were giving him a lot of trouble. Pltf. Dep., pp. 47-48.

66.     Plaintiff admitted that he has no knowledge of Robinette having ever made any derogatory comments about Chinese people – their ethnicity, national origin, or race. Pltf. Dep., p. 53.

13

67. Plaintiff admitted that he has no firsthand knowledge of Robinette having any discriminatory feelings about persons of Chinese ancestry. Pltf. Dep., p. 55.

68. Plaintiff admitted that he has no knowledge of Robinette ever saying anything derogatory to Plaintiff directly, or about Plaintiff to any other employee. Pltf. Dep., pp. 53-54.

69. Plaintiff believes that Robinette was involved in approving LNU hiring Plaintiff for the 2007-2008, 2008-2009, and 2009-2010 academic years, and that at the time of hiring, Robinette was aware of Plaintiff's race/national origin. Pltf. Dep., pp. 25-27, 30-31.

70. Robinette has no reason to believe that Plaintiff's ancestry, race or national origin had anything to do with his termination. Robinette Aff., ¶ 25.

# ARGUMENT

This Court is obviously familiar with the standard for reviewing motions for summary judgment. *See*, *e.g.*, *Reed v. Coll. of the Ouachitas*, 2012 U.S. Dist. LEXIS 56227, 3-4 (W.D. Ark. Apr. 23, 2012) (per Dawson, D.J.). Briefly, in determining whether summary judgment is appropriate, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Reed*, at *3-4, *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Reed*, at *3-4.

Plaintiff asserts two claims in his Second Amended Complaint: Count I alleges that MSU discriminated against Plaintiff in violation of Title VII based upon Plaintiff's "race/national origin (Chinese/Asian)"; and Count II alleges that MSU tortiously interfered with a contract between plaintiff and "LNU-MSU College of International Business for the 2009-2010 school year." *Second Amended Complaint*, Doc. 42, ¶¶ 14, 22-26. The University is entitled to summary judgment as a matter of law for four reasons: (1) MSU was not Plaintiff's employer under Title VII; (2) even if MSU were deemed to be Plaintiff's employer under Title VII, Plaintiff cannot establish a *prima facie* claim of national origin/race discrimination; (3) Plaintiff has no evidence of pretext to overcome the legitimate reason articulated for Plaintiff's termination; and (4) the University has sovereign immunity with respect to Plaintiff's claim for tortious interference.

## I.    THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I BECAUSE IT WAS NOT PLAINTIFF'S EMPLOYER UNDER TITLE VII.

Title VII makes it "an unlawful employment practice for an *employer* . . . to discriminate against any individual with respect to his compensation . . . because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Plaintiff may argue that MSU

15

was Plaintiff's "joint employer" under Title VII. Courts from various Circuits have emphasized a number of considerations relevant to the factual determination of whether an entity exercised sufficient control over employees to constitute a "joint employer." *Rivas v. Fed. de Asociaciones Pecuarias*, 929 F.2d 814, 820-821 (1st Cir. 1991) (finding no "joint employer" status). The Seventh Circuit has noted, for instance, the relevance of "such factors as the supervision of the employees' day-to-day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, and issuance of operating instructions." *G. Heileman Brewing Co., Inc. v. NLRB*, 879 F.2d 1526, 1531 (7th Cir. 1989). *See also Clinton's Ditch Co-op Co., Inc., v. NLRB*, 778 F.2d 132, 138-39 (2d Cir. 1985), *cert. denied*, 479 U.S. 814, 93 L. Ed. 2d 25, 107 S. Ct. 67 (1986) (emphasizing five factors: (1) hiring and firing; (2) discipline; (3) pay, insurance and records; (4) supervision; and (5) participation in the collective bargaining process).

Here, as in the cited cases, Plaintiff's work was supervised by LNU rather than MSU employees. Plaintiff has no evidence that Robinette or any other MSU employee supervised any of his activities, determined what he would teach or how he would teach it, determined his salary, paid his salary, etc. To the contrary, Plaintiff specifically agreed in his various employment contracts with LNU that LNU, not MSU, would "conduct direction, supervision and evaluation" of Plaintiff's work. SUMF, ¶¶ 34-46. This arrangement – vesting the power in LNU exclusively with regard to the direction, supervision and evaluation of work – was required by Chinese law in order for Plaintiff to be permitted to work in China, at a Chinese institution. *Id*. Defendants have not located any cases in which a "joint employer" relationship has been found under similar facts.

Moreover, Plaintiff indisputably entered into four separate employment contracts with LNU each of which specified that LNU would "conduct direction, supervision and evaluation" of Plaintiff's work. *See* Exhibits D, E, F and G. Each employment contract was executed by Dean Dong, an employee of LNU, not MSU. SUMF, ¶¶ 34-46. Plaintiff worked in China where LNU is located, was paid in Chinese currency, and paid taxes to the Chinese government. *Id.* Plaintiff never entered into any employment contract with MSU, never received a paycheck from MSU, and never received a W-2 or other tax forms from MSU. *Id.*, ¶¶ 29-31. Plaintiff's day-to-day work activities were not supervised my MSU. *Id.*, ¶ 22.

LNU and MSU are entities that function and operate independently of one another. MSU is located in Missouri – LNU is located in China. *Id.*, ¶ 14. They each manage their own affairs and employees. *Id.*, ¶¶ 8-12. The two universities have separate payroll and insurance programs as well as separate personnel and administration. *Id.*, ¶ 14. Furthermore, the labor relations at LNU and MSU are distinct. *Id.*, ¶ 11. Disputes of LNU employees are handled by LNU. *Id.* These universities clearly do not operate jointly.

Even with respect to the COIB, LNU and MSU maintain separate and distinct roles. While MSU has the authority to approve the instructors who will teach the curriculum (as is required for purposes of U.S. accreditation), LNU employs these individuals in accordance with Chinese law. *Id.*, ¶ 17. LNU enters into contracts with faculty and pays them in Chinese currency. *Id.*, ¶¶ 18-20. As to management, ownership, and finances, MSU and LNU do not share common officers or members on their respective governing boards. Furthermore, the two institutions maintain separate bank accounts. There is an account in China for the COIB, but only LNU employees have access to this account. *Id.*, ¶ 14.

Applicable case law supports the conclusion that MSU was not Plaintiff's "joint employer." *See Shah v. Littelfuse Inc.*, 2013 U.S. Dist. LEXIS 61081 (N.D. Ill. Apr. 29, 2013) (summarizing case law).[1] Numerous decisions demonstrate that where the supervision and control over an employee's day-to-day activities is vested in one, rather than both entities, no "joint employer" relationship exists. Here, both in accordance with Chinese law, and in practice, Plaintiff's day-to-day activities were directed exclusively in LNU.

Plaintiff may argue that Robinette, an MSU employee, approved of Plaintiff's termination. However, merely "approving" of an employment action does not make an entity a joint employer. *See, e.g., Adams v. Valega's Prof. Home Cleaning, Inc.*, 2012 U.S. Dist. LEXIS 157550 (N.D. Ohio Nov. 2, 2012) (providing advice about the suitability of potential employees does not equate to making the hiring decision itself – not a joint employer); *Braden v. County of Washington*, No. 08-574, 2010 U.S. Dist. LEXIS 40084, 2010 WL 1664895, at *7 (W.D. Pa. Apr. 23, 2010) (no evidence defendant maintained direct or indirect control over work schedules or working conditions, determined (rather than approved) rate and method of compensation, or had power to hire or fire; also, no evidence that worker reported to, or received direction or supervision from, defendant). Even assuming Robinette "approved" Plaintiff's termination, that fact, in and of itself, is insufficient to support a finding of "joint employer" status.

Finally, it is undisputed that Plaintiff initiated litigation in China against LNU to recover sums relating to the termination of his employment. Indeed, Plaintiff obtained a judgment for money damages and recovered that judgment. Plaintiff may argue that he attempted to sue MSU in China (he made this claim in his deposition), but the fact remains that Plaintiff asserted in the

---

[1] *See, e.g., Wilcox v. Allstate Corp.*, 2012 U.S. Dist. LEXIS 177929, at *11-12 (N.D. Ill. Dec. 17, 2012) (no joint employer relationship where defendant did not supervise plaintiff, direct or control plaintiff's assignments, provide plaintiff feedback, or process plaintiff's requests for time off); *Mitchem v. Edmond Transit Mgmt., Inc.*, 2012 U.S. Dist. LEXIS 86921 (W.D. Okla. 2012) (complaint against city as a co-employer dismissed because plaintiff failed to allege that city exercised significant control over plaintiff's employment).

18

Chinese litigation that LNU was his employer. Plaintiff recovered a money judgment against LNU as his employer. Plaintiff should be judicially estopped from asserting in this case that MSU, rather than LNU, was his employer, or was a "joint employer."[2]

In sum, MSU was not Plaintiff's employer for purposes of Title VII. As a result, MSU is entitled to summary judgment.

## II. THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I BECAUSE PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE.

Even assuming Plaintiff were able to demonstrate that MSU was Plaintiff's "joint employer" under Title VII, the University would still be entitled to summary judgment. A plaintiff can survive summary judgment in the context of a Title VII discrimination claim in one of two ways – through the use of "direct evidence" of discrimination, or by using the *McDonnell Douglas* "indirect evidence" burden shifting analysis. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045 (8th Cir. 2011) (*en banc*), *cert. denied*, 132 S.Ct. 513 (2011).[3]

### A.     Plaintiff has no "direct evidence" of discrimination.

"Direct evidence" of discrimination, in this context, is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972-73 (8th Cir. 2012), *citing Torgerson*, 643 F.3d at 1045. "Direct evidence" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. *Id.* A plaintiff with "*strong* (direct) evidence that illegal

---

[2] The purpose of the doctrine of judicial estoppel is "to protect the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine,* 532 U.S. 742, 749-50 (2001) (citations omitted). In other words, courts apply the doctrine to judicial estoppel to prevent a party from taking a position in a proceeding that is clearly at odds with a position taken in a prior proceeding. *Id.* at 749.

[3] The Eighth Circuit's *en banc* decision in *Torgerson* appears to be the leading authority on summary judgment analysis of national origin discrimination claims applicable to this case.

19

discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas Corp. v. Green* . . . analysis to get to the jury . . ." *Id.* (emphasis added).

Plaintiff has no evidence, let alone "*strong* evidence" that "*clearly* points to the presence of an illegal motive," to support his claim that his termination violated Title VII. Indeed, Plaintiff has produced no evidence "showing a specific link between the alleged discriminatory animus and the challenged decision" – in this case, Plaintiff's termination – "sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" Plaintiff's termination. *Guimaraes*, 674 F.3d at 972; *Torgerson*, 643 F.3d at 1044; *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997). With regard to the three persons whom Plaintiff claims were involved in the decision to terminate Plaintiff – Coutts (COIB Acting Associate Dean), Shepherd (COIB former Associate Dean), and Robinette (MSU's Director of Academic Outreach and Support and Direct of China Operations) – Plaintiff admits that the only MSU employee in that group, Robinette, has never said or done anything that indicates he harbors any discriminatory animus whatsoever. SUMF, ¶¶ 66-68. Plaintiff could not identify a single comment he attributes to Robinette that supposedly shows discriminatory beliefs with regard to persons of Chinese ancestry. *Id.*

To the extent that Plaintiff claims LNU employee Shepherd had discriminatory views about persons of Chinese ancestry/race, there is also no direct evidence that Shepherd was motivated by discriminatory animus with regard to Plaintiff's termination. None of the alleged statements attributed to Shepherd supposedly demonstrating a dislike of persons of Chinese ancestry are in any way related to Plaintiff's termination. SUMF, ¶¶ 65.a.-c. Comments suggestive of discriminatory animus unrelated to the challenged employment action are not direct evidence of discrimination. *See, e.g., Guimaraes*, 674 F.3d at 973 (statement about a

20

"green card" did not show a specific link between the challenged employment action and discriminatory animus); *Torgerson*, 643 F.3d at 1045-1046 ("a remark by a decision-maker, in order to be direct evidence of . . . discrimination, must show a specific link between a discriminatory bias and the adverse employment action . . ."); *Lee v. Rheem Mfg. Co.*, 432 F.3d 849, 853 (8th Cir. 2005) (affirming summary judgment by Judge Dawson and holding that statements did not demonstrate a specific link between the alleged age-related discriminatory animus and the employer's decision not to hire the plaintiff).

It is undisputed that Plaintiff has produced no evidence of any statements by any alleged decision-makers about Plaintiff himself. Statements that do not relate to the plaintiff are not direct evidence of discrimination. *Torgerson*, 643 F.3d at 1046; *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1017-18 (8th Cir. 1999).

In sum, Plaintiff has no direct evidence linking discriminatory animus to Plaintiff's termination.

**B. Plaintiff cannot establish a *prima facie* case of discrimination using indirect evidence under *McDonnell Douglas*.**

"If the plaintiff lacks evidence that *clearly* points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* [*v. Green*, 411 U.S. 792 (1973)] analysis, including sufficient evidence of pretext." *Guimaraes*, 674 F.3d at 972-73, *citing Torgerson*, 643 F.3d at 1045 (emphasis added). To establish a *prima facie* case of discrimination, Plaintiff must show that 1) he is a member of a protected class; 2) he met the University's legitimate expectations; 3) he suffered an adverse employment action; and 4) the circumstances give rise to an inference of discrimination. *See Muor v. U.S. Bank Nat'l Ass'n*, 716 F.3d 1072, 1076 (8th Cir. 2013); *Guimaraes*, 674 F.3d at 973-74. While the University respectfully submits that Plaintiff

cannot establish that he met the University's legitimate expectations, the focus of this section of the University's motion is on Plaintiff's inability to establish the fourth element of his *prima facie* case – that the circumstances do not give rise to an inference of discrimination.

### 1. The location of the program and the demographics of the LNU faculty and staff, and the COIB student body, completely undermine Plaintiff's *prima facie* case.

In a nutshell, Plaintiff's claim that he was subjected to discrimination because of his Chinese ancestry or race is absurd. Plaintiff was hired to work at LNU's campus in China, teaching Chinese students, surrounded by Chinese staff and faculty, under the direction of a Chinese citizen (Dean Quangcai Dong). SUMF, ¶¶ 15, 19, 25-27, 32, 44. Plaintiff admitted in his deposition that LNU employs numerous faculty members of Chinese ancestry or race at the COIB. *Id.*, ¶ 25. In the fall of 2009, for instance, LNU employed the following persons of Chinese ancestry as faculty members at the COIB: Bin Jun Li, Victor Chang, Grace Chen, Charlie Kong, Marvel Ma (Plaintiff), Rachen Che, Chen Xue Brooks (possibly). *Id.* Plaintiff admitted that virtually the entire staff at the COIB is Chinese. *Id.*, ¶ 26. Nothing about Plaintiff's employment arrangement supports an inference that MSU, LNU or COIB personnel harbored discriminatory animus against persons of Chinese ancestry/race/nationality.

### 2. Plaintiff was replaced by another employee of Chinese and/or Asian ancestry.

Plaintiff concedes that he was replaced by another employee of Chinese and/or Asian ancestry – Joseph Cheong. *Id.*, ¶ 61. In the context of a discriminatory termination claim, replacement of a plaintiff with another employee in the same protected class substantially undermines the plaintiff's *prima facie* case. *See Walker v. St. Anthony's Medical Ctr.*, 881 F.2d 554, 558 (8th Cir. 1989) (explaining that if a woman alleging sex discrimination is replaced by a female, that fact is certainly a relevant consideration, especially as it relates to the employer's

motive).  No reasonable jury could find that discriminatory animus motivated the decision to terminate Plaintiff's employment when Plaintiff was replaced by Mr. Cheong.

### 3. Plaintiff alleges that Robinette both hired and terminated Plaintiff.

Plaintiff has testified that he believes that Robinette both approved Plaintiff's hiring and his termination.  SUMF, ¶¶ 52, 69.  Numerous courts have held that when the same persons are involved in both the hiring and termination of an employee, the plaintiff cannot establish that the circumstances give rise to an inference of discrimination.  *See, e.g., Takele v. Mayo Clinic*, 576 F.3d 834, 839 (8th Cir. 2009); *Calvin v. Yellow Freight Sys., Inc.*, 218 F.3d 904, 906-07 (8th Cir. 2000) ("The courts have held that it is unlikely that a person would hire a minority and then . . . decide to fire that same person based on the minority status.").

In sum, Plaintiff cannot establish a *prima facie* case of national origin/race discrimination in this case because none of the circumstances surrounding Plaintiff's employment or termination give rise to an inference of discrimination.

## III. THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I BECAUSE PLAINTIFF LACKS SUFFICIENT EVIDENCE OF PRETEXT.

Even if Plaintiff were able to establish that the University was Plaintiff's employer under Title VII and further establish a *prima facie* case of discrimination, the University would still be entitled to summary judgment.  Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production then shifts to the employer to "articulate a legitimate, nondiscriminatory reason" for the challenged action. *Torgerson*, 643 F.3d at 1044.  If the employer does so, the burden then shifts back to the plaintiff to prove that the proffered reason is pretext for discrimination. *Id.*  The plaintiff retains at all times the ultimate burden of proof and persuasion that the University discriminated against him. *Id.*; *Muor*, 716 F.3d at 1076.

In this case, LNU articulated a legitimate, non-discriminatory reason for Plaintiff's termination – repeated class absences. Importantly, Plaintiff admitted in his deposition that he missed classes during the Fall 2009-2010 semester. SUMF, ¶¶ 58-59. In all, Plaintiff missed as many as eight classes. Absence from work is clearly a legitimate, non-discriminatory reason for the termination of an employee. *Lovland v. Employers Mut. Cas. Co.*, 674 F.3d 806, 813 (8th Cir. 2012); *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1044 (8th Cir. 2010) ("[a]bsenteeism constitutes a legitimate, non-discriminatory reason for termination"); *Kenyatta v. Bookey Packing Co.*, 648 F.2d 552, 555 (8th Cir. 1981).

Because an undisputedly legitimate reason existed to terminate Plaintiff's employment, Plaintiff must produce evidence sufficient to create a genuine issue of material fact concerning whether the proffered reasons are pretext for intentional discrimination based on Plaintiff's national origin. *Muor*, 716 F.3d at 1076; *Torgerson*, 643 F.3d at 1046. While Plaintiff claims that Shepherd wished to terminate Plaintiff's employment for reasons other than absence from class, none of the reasons given by Plaintiff relate to discrimination. For instance, Plaintiff claims that Shepherd was having an inappropriate relationship with an LNU student and that he eventually left LNU's employment to pursue that relationship. *See, e.g.,* SUMF, ¶¶ 62.b.-c; Exhibits I and J.

Numerous decisions from the Courts of this Circuit have found the absence of adequate proof of pretext in analogous contexts. For instance, in *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711 (8th Cir. 2012), the Court held that the plaintiff failed to produce sufficient evidence of pretext by showing that the University's explanation for the plaintiff's compensation was pretextual. *Id.* at 716. In *Muor*, the Court held that the plaintiff failed to demonstrate that U.S.

Bank's legitimate, non-discriminatory reason for issuing a warning – Muor's poor performance – was pretextual. *Muor*, 716 F.3d at 1076.

Plaintiff may claim that there are similarly situated persons with absences from class who were treated more favorably. However, "at the pretext stage, 'the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.'" *Muor*, 716 F.3d at 1078; *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012). To succeed with this argument, Plaintiff must show that he and the non-Asian employees were "similarly situated in all relevant respects." *Id.* That is, the employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.*; *see also Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011).

Plaintiff may not, for instance, merely claim that other non-Asian faculty members missed classes. Plaintiff must establish that those persons were also supervised by the same persons, that they missed the same number of classes in similar circumstances, and that there were no other mitigating or distinguishing circumstances. In *Muor*, the plaintiff relied on testimony by several non-Asian employees who worked at U.S. Bank under the same supervisor. The Court held that although the employees discussed making errors in general and not receiving written warnings for them, the plaintiff did not establish that these other employees were similarly situated to her *in all relevant respects*. The Court held that Muor offered no evidence that the comparator employees made similar errors, made errors as frequently as she, or that their level of experience was commensurate to hers. *Muor*, 716 F.3d at 1078.

It should also be remembered that "when different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects." *Onyiah*, 684 F.3d at 718;

*Stanback v. Best Diversified Prods., Inc.*, 180 F.3d 903, 910 (8th Cir. 1999). Plaintiff admitted that Shepherd only became his supervisor in the Fall of 2009. Decisions by Shepherd's predecessors regarding absences by other faculty members are irrelevant to the pretext analysis.

The burden to demonstrate that persons are similarly situated in all material respects is high – as has been repeatedly demonstrated in Eighth Circuit national origin/race discrimination cases. For instance, in *Takele v. Mayo Clinic*, the Court held that the plaintiff failed to show that a white physician was similarly situated where that physician was successfully progressing through the program, and any concerns were successfully resolved over time. 576 F.3d at 839. Additionally, the plaintiff admitted that he had no knowledge about the schedule, faculty interaction, or training of the other physician. *Id.* Here, as in *Takele*, Plaintiff has no information regarding the specifics of other faculty members' absences. Plaintiff simply cannot identify specific information concerning other faculty members who missed classes.

After his termination, Plaintiff wrote numerous communications to persons at LNU and at MSU complaining about his termination. The consistent refrain in Plaintiff's communications was that he was fired by Shepherd (an LNU employee) because Plaintiff was exposing Shepherd's allegedly improper relationship with a student. SUMF, ¶¶ 62 a.-f. and related Exhibits. This case is similar to the facts of *Takele* where during the appeals process relating to his termination "Takele never asserted that Mayo discriminated against him on the basis of race or national origin." *Takele v. Mayo Clinic*, 576 F.3d at 839. Rather, the plaintiff stated that "[t]he true reason they want to expel me" was that the plaintiff was "well prepared to the field, ambitious, hard working." *Id.*

In sum, Plaintiff cannot support his claim with sufficient evidence of pretext to warrant a trial in this case. The University is entitled to summary judgment as a matter of law.

## IV.   THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II UNDER THE DOCTRINE OF SOVEREIGN IMMUNITY.

In Count II, Plaintiff alleges that MSU tortiously interfered with a contract between plaintiff and "LNU-MSU College of International Business for the 2009-2010 school year." *Second Amended Complaint*, Doc. 42, ¶¶ 22-26.  To prove his claim of tortious interference with a contract or business expectancy, Plaintiff must establish: (1) the existence of a contract or business expectancy; (2) that the University had knowledge of the contract or relationship; (3) that Defendant intentionally interfered by inducing or causing a breach of the contract or relationship; (4) absence of justification for such interference; and (5) damages resulting from Defendant's conduct.  *Western Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 19 (Mo. banc 2012).

Initially, it is important to note that Plaintiff did not have a contract with the LNU-MSU College of International Business as he alleges in his Second Amended Complaint.  Rather, it is undisputed that Plaintiff's employment contracts have always been with LNU.  SUMF, ¶¶ 43-46.

Most importantly, Plaintiff's claim is barred because the University is entitled to sovereign immunity.  Public entities in Missouri are protected from actions in tort under the doctrine of sovereign immunity.  R.S.Mo. § 537.600; *Southers v. City of Farmington*, 263 S.W.3d 603, 609 (Mo. 2008).  MSU is a public university created by the Missouri legislature. R.S. Mo. §§ 174.020, *et seq.*  MSU is under the general control and management of a Board of Governors, which consists of nine members appointed by the Governor with the advice and consent of the Missouri Senate.  R.S.Mo. §§174.040, 174.450, 174.453.2, 174.455 and 174.457. As such, the University is a public entity within the meaning of Section 537.600, and it is immune from suit for liability in tort in the absence of an express statutory provision or waiver of such immunity.  *See Dorlon v. City of Springfield*, 843 S.W.2d 934, 939 (Mo. App. 1992)

(holding that the Regents of Southwest Missouri State University – the previous name of MSU – were protected by the doctrine of sovereign immunity under R.S.Mo. § 537.600).

Section 537.600 creates two exceptions to the broad rule of immunity from common law actions in tort: claims arising out of the negligent operation of motor vehicles by public employees, and claims arising out of the dangerous condition of a public entity's property. *Id.* Neither of these exceptions apply here. Additionally, in certain limited circumstances, the legislature has created specific exceptions to the rule of immunity. For example, the legislature created an exception to the rule of immunity to statutory actions in tort in the context of the Missouri Human Rights Act (hereafter "MHRA"). The MHRA creates a statutory action in tort for violations of the Act by "employers." It defines "employer" to include "the state, or any political or civil subdivision thereof. . ." thereby explicitly waiving the application of sovereign immunity in that context. R.S.Mo. §§ 213.010(7) and 213.011; *Howard v. City of Kan. City*, 332 S.W.3d 772, 779 (Mo. 2011). Public entities can also waive their sovereign immunity by purchasing liability insurance for tort claims. R.S.Mo. § 537.610.

Generally, waivers of sovereign immunity are narrowly construed in order "to preserve the state's sovereign rights and to protect its capacity to perform necessary governmental functions." *Carpenter v. King*, 679 S.W.2d 866, 868 (Mo. banc 1984). The waiver must show an express consent to be sued. *Krasney v. the Curators of the Univ. of Mo.*, 765 S.W.2d 646, 650 (Mo. App. 1989). Additionally, "[l]iability of a political subdivision for torts is the exception to the general rule of sovereign immunity, hence it is incumbent on a party seeking to establish such liability to demonstrate an exception exists." *State ex rel. Ripley County v. Garrett*, 18 S.W.3d 504, 509 (Mo. App. 2000).

Plaintiffs' Second Amended Complaint does not plead any facts in Count II supporting the assertion that MSU waived its defense of sovereign immunity to tortious interference claims. Unlike the statutory claims under the MHRA, a claim of tortious interference exists only at common law, and no legislative waiver of immunity exists. In fact, Missouri courts have previously dismissed claims of tortious interference against public entities, finding that the governmental body was immune from such claims. *See, e.g.*, *V.M.B. v. Mo. Dental Bd.*, 74 S.W.3d 836, 839 (Mo. App. 2002) (noting that the trial court dismissed plaintiff's tortious interference claim against the Missouri Dental Board because it was barred by sovereign immunity).

Furthermore, there is no evidence before this Court – nor could there be – that MSU has purchased any liability insurance that would waive the application of sovereign immunity in this context. Although the University participates in the Missouri Legal Expense Fund as set forth in R.S. Mo. §105.711, participation in this fund does not waive sovereign immunity. *See Casady v. Bd. of Governors of Northeast Mo. State Univ.*, 875 S.W.2d 909, 913-14 (Mo. App. 1994) (holding that participation in the State Legal Expense Fund under R.S.Mo. § 105.711, *et seq.* alone does not waive the sovereign immunity provided to public entities in R.S.Mo. § 537.600).

In sum, MSU is a public entity protected from liability in tort under the doctrine of sovereign immunity, and it has not waived this protection. Plaintiffs' claim against the University for tortious interference is barred and MSU is entitled to summary judgment as to Count II of Plaintiff's Second Amended Complaint.

## CONCLUSION

For the reasons set forth above, Plaintiff's claims against MSU and the summary judgment record before this Court fail to raise a genuine issue of material fact warranting a trial. The University is entitled to summary judgment on all Counts, its costs incurred herein, and any other and further relief as this Court deems just and proper.

Respectfully submitted,

TUETH KEENEY COOPER
MOHAN & JACKSTADT, P.C.

/s/ Ian P. Cooper
Ian P. Cooper                        #32133
34 N. Meramec, Suite 600
St. Louis, Missouri 63105
Telephone:  (314) 880-3600
Facsimile:  (314) 880-3601
Email:  icooper@tuethkeeney.com

        -and-

Ryan DeBoef                          #57546
Missouri State University
901 South National Ave.
Carrington 205
Springfield, Missouri 65897
Telephone:  (417) 836-8503
Facsimile:  (417) 836-6777
E-mail:  ryandeboef@missouristate.edu

ATTORNEYS FOR THE BOARD OF GOVERNORS OF
MISSOURI STATE UNIVERSITY

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 3rd day of September, 2013, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

Jeffrey W. Bruce
Bruce Law Firm
2103 E. 195th Street
P.O. Box 797
Belton, MO 64012-0797
Phone: (816) 322-7400
Fax: (816) 322-7402
Email: bruce.law@att.net

/s/ Ian P. Cooper
Attorney

31