IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| MARVEL MA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-03048-CV-S-BP |
| ) | |
| MISSOURI STATE UNIVERSITY, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## ORDER

This matter comes before the Court on Defendant Board of Governors of Missouri State University's ("MSU") Motion for Summary Judgment, (Doc. 64), and its Motion to Strike Plaintiff's Statement of Additional Disputed or Undisputed Material Facts and/or Various Supporting Exhibits, (Doc. 109.) MSU moves for summary judgment on Plaintiff Marvel Ma's claims of race and/or national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and tortious interference with a contract between Plaintiff and LNU-MSU College of Business. MSU further moves to strike the statement of additional facts submitted by Ma in his Opposition to Defendant's Motion for Summary Judgment, (Doc. 103), and various exhibits thereof. For the following reasons, MSU's Motions are **DENIED**.

**I.      Motion to Strike**

The Court has fully considered MSU's Motion to Strike and has relied only upon the facts the Court may properly consider on a motion for summary judgment. Any facts to which MSU objected but were relied upon by the Court are noted below.

## II. Background[1]

Ma, an Asian male of Chinese national origin, was employed as a non-tenured faculty member at the LNU-MSU College of International Business ("COIB") campus pursuant to annual contracts from August 2006 through October 2009. Ma was recruited to work for the COIB by Dr. Yongwei Zhang, who was employed by MSU at the time. On October 29, 2009, Ma's employment was terminated.

Stephen Robinette is MSU's Director of Academic Outreach and Support and Director of China Operations. Dean Guang Cai Dong was the Dean of the COIB. Dan Shepherd, a white/Caucasian American, was hired as an instructor at the COIB in fall of 2008 and became the Associate Dean for the COIB in January 2009. Mike Coutts replaced Shepherd as Acting Associate Dean in October 2009.

### A. Facts Related to the Operation of COIB

The COIB was created by the collaboration of MSU and Liaoning Normal University ("LNU"), a Chinese University located in Dalian, China. Each university is a separate entity with no common officers. MSU and LNU entered into a Master Agreement regarding the operation of the COIB in 2003. (Master Agreement, Doc. 65-2.) The mission of the collaboration was to "conduct educational and cultural exchanges between the two universities and to promote understanding and friendship between the two countries." (*Id.*) The contract provided in part that "[a]cademic programs for [MSU] university credit will adopt curricula, lesson plans, textbooks, and other teaching materials selected and determined by [MSU]." (*Id.*) MSU also "approve[d] or provide[d]" teachers for the COIB campus and "primarily managed"

---

[1] The Court has considered the parties' statements of material facts supported by evidence and drawn all inferences in favor of the non-movant. *Heacker v. Safeco Ins. Co. of Am.*, 676 F.3d 724, 726 (8th Cir. 2012). Included in this section are facts that the Court concludes are uncontroverted and supported by the evidentiary record. Where indicated, this section also includes allegations and the parties' disputes.

2

the campus.  (*Id.*)  Further, each university is reimbursed for any expenses paid for the benefit of the COIB.  (*Id.*)

All COIB employees who are not Chinese citizens have contracts with LNU as "foreign experts."  Ma's 2009-2010 employment contract references LNU and the COIB as the other parties to the employment contract.  The employment contract gives the authority for "direction, supervision and evaluation" of Ma to LNU.  (2009-2010 Contract, Doc. 65-7, p. 3.)  The COIB students registered for classes using MSU's website Grizzly Den and the COIB's faculty members had MSU email addresses.  (Ma Aff., Doc. 103-3, ¶¶ 14, 23.)

The COIB's instructors, including Ma, were paid by LNU, who also handled any related withholdings.  The salaries for the COIB employees were determined based upon a budget jointly developed by the two universities.  (Robinette Depo., Doc. 103-7.)  Robinette and Dong discussed contract renewals, salaries and housing allowances, and contract terms such as effective and termination dates and probationary periods.  (Doc. 103-8, pp. 2-3, 11-12.)  Further, Robinette advised Dong to require direct deposits for the COIB employees and not to renew the contracts of employees who did not want to be paid in that way.  (Doc. 103-8, p. 14.)  Robinette also made changes to the faculty handbook given to instructors of the COIB.  (Robinette Depo., Doc. 103-7.)

Robinette also made recommendations regarding the employment of at least three people at the COIB, namely Shepherd, Coutts, and Martin Wolf.  (Doc. 103-8, p. 1; Robinette Depo., Doc. 103-7.)  In fact, Robinette went so far as notifying Coutts of his promotion to Acting Associate Dean before confirming it with Dong.  (Doc. 103-11, p. 4.)  During the course of Ma's employment, Robinette was made aware of various employment issues at the COIB.  (Robinette Depo., Doc. 103-7.)  He had the authority to discuss or express opinions regarding employment

3

decisions. (*Id.*) Robinette routinely talked with Shepherd regarding the operation of the COIB, and they discussed Ma in particular during the start of the 2009 semester. (*Id.*) Further, emails and documents from the COIB staff, including Coutts and Dong, indicate Robinette made the termination decision, but Robinette asserts those were incorrect statements as his role was merely advisory. (*Id.*) Specifically, Robinette and/or MSU are referenced as decision-makers in the initial termination letter of October 29, 2009 and the second letter from signed by Dong on November 23, 2009. (Doc. 103-11, pp. 2, 12.)

### B. Facts Related to Employment Discrimination

In fall of 2008, Ma shared an office with Shepherd and Charlie Kong, a fellow instructor. Ma witnessed an argument between Shepherd and Kong, after which Shepherd allegedly said he "wouldn't take shit from a Chinese fucker." During this time period, Ma claims he heard Shepherd refer to a Chinese co-worker as an animal, either a monkey or a dog, and his Chinese secretary, as a "sassy chink with an attitude." (Ma Aff., Doc. 103-3, ¶ 29.)

It is undisputed that Ma's employment situation began to deteriorate in late summer 2009. Ma alleges he and Shepherd had issues regarding the registration of his classes. Beginning on August 23, Ma requested his class schedule from Shepherd. (Doc. 103-11, p. 16.) On August 25, Ma again asked for his classes schedule and Shepherd told him the class times were not finalized. (*Id.* at p. 17.) In addition, Shepherd told Ma his classes "should be going but I don't have it on the computer yet." (Ma Aff., Doc. 103-3, ¶ 22.) Two days later, Shepherd indicated Ma had missed two classes. (Doc. 103-11, p. 18.) After several email exchanges regarding class times and registration, Shepherd indicated Ma could start his classes on Monday, August 31 at 1:00 p.m. (*Id.*)

During this time, Ma asserts Shepherd made comments regarding Ma's race. First, in a meeting on August 26 regarding student absences, Shepherd allegedly stated, "Why do I get so much trouble from you fucking people?" (*Id.* at ¶ 31.) Second, in a meeting on August 31 regarding Ma's absences and having other employment in violation of his employment contract, Shepherd allegedly stated, "all you fucking Chinese people" were causing trouble or driving him crazy. (*Id.* at ¶ 32.) At this time, Shepherd believed he had verbally voided Ma's contract. (Doc. 103-11, p. 13.) However, between August and October, Ma was still an employee, but his pay was reduced and he no longer received a housing allowance.

Ma was officially terminated in a meeting on October 29, 2009 by Mike Coutts, the Acting Associate Dean. (Termination Letter, Doc. 103-11.) Coutts replaced Shepherd who had resigned on October 28. Also present at the meeting were Ryan Pederson, the Academic Regulations and Integrity Coordinator, and David Hamilton, Assistant to the Associate Dean. (Ma Aff., Doc. 103-3, ¶ 21.) Coutts gave Ma a termination letter signed by Coutts and listing Shepherd and Robinette under his signature. The decision to terminate Ma came primarily from the information provided by Shepherd. (Robinette Depo., Doc. 103-7.)

Ma's teaching duties were assumed by Joseph Cheong. MSU asserts Cheong is of Chinese or Asian descent, while Ma asserts he does not know Cheong's race and/or national origin.[2]

---

[2] Ma argues there are similarly situated employees at the COIB that were not fired despite having multiple absences. However, Ma has not submitted admissible evidence regarding the absences or the circumstances surrounding the absences that would allow the Court to consider those employees. *See Muor v. U.S. Bank Nat. Ass'n*, 716 F.3d 1072, 1078 (8th Cir. 2013) (holding similarly situated employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances"); *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir. 1994)(declining to consider plaintiff's unsubstantiated allegations regarding similarly situated employees in racial discrimination case).

Over the next several months, Ma sent emails and letters to various individuals at LNU, MSU, and the COIB requesting information regarding his absences and disputing his termination. Discrimination is not explicitly mentioned in the emails. Rather, the correspondence references Shepherd's lack of professionalism, difficulty in dealing with the Chinese staff, and derogatory comments.

In 2010, Ma pursued legal action against LNU in China and received a judgment for breach of his 2009-2010 employment contract. MSU was not a party to the action in China.

### III. Analysis

#### A. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." *Heacker v. Safeco Ins. Co. of Am.*, 676 F.3d 724, 727 (8th Cir. 2012). Substantive law identifies which facts are material. *Id.* A party can show that a fact is not genuinely disputed by "showing that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). When ruling on a motion for summary judgment, the Court should view the facts in the light most favorable to the adverse party and allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Reed v. ULS Corp.*, 178 F.3d 988, 990 (8th Cir. 1999).

After the moving party establishes the absence of genuine factual issues and entitlement to judgment as a matter of law, the nonmoving party must establish by evidence that a material factual issue exists for trial, not merely rest on denials or the allegations. *Barge v. E. Anheuser-*

6

*Busch, Inc.*, 87 F.3d 256, 258 (8th Cir. 1996). A moving party is "entitled to judgment as a matter of law" if the nonmoving party fails to demonstrate an essential element of a claim for which it has the burden of proof. *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990).

There is no "discrimination case exception" to summary judgment. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011). Instead, summary judgment "is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Id.*

### B. Joint Employer

First, MSU argues it was not Ma's employer and therefore cannot be held liable for employment discrimination. Title VII makes it unlawful for "an employer . . . to discriminate against any individual" on the basis "of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). When two separate entities are closely tied, they may be considered a single employer for Title VII purposes. *See Baker v. Stuart Broad. Co.*, 560 F.2d 389, 391-92 (8th Cir. 1977). In determining whether entities are joint employers, a court considers: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations; and (4) common ownership or financial control." *Id.* at 392; *see also Sandoval v. Am. Bldg. Maint. Indus. Inc.*, 578 F.3d 787, 796 (8th Cir. 2009). Viewing the facts in a light most favorable to Ma, the Court concludes a reasonable jury could find MSU is Ma's joint employer. Each factor will be discussed in turn below.

First, interrelation of operation examines "whether two entities share managers and personnel, payroll, insurance programs, office space and equipment[,]" "whether the entities operated as a single unit[,]" and the presence of a common function or purpose. *Davis v. Ricketts*, 2014 WL 4211355 at *3 (8th Cir. 2014). While the operations of MSU and LNU are

7

not interrelated on all matters, on matters concerning the COIB, evidence suggests the two entities had significant interrelated operations. First, LNU and MSU entered a formal contract to collaborate and operate the COIB. The universities run the program from tuition paid to the COIB and share in any profits. Each university was reimbursed from the COIB funds for expenses incurred for the benefit of the COIB. Further, both universities play roles in management of the COIB. MSU's duties include approval the COIB instructors' credentials for accreditation purposes; setting forth the curricula, lesson plans, textbooks, and other teaching materials for the courses; and primarily managing the COIB campus. LNU contracts with the instructors and provides facilities in China for the program. Further, MSU's registration website and email server were used for COIB courses and instructors. Robinette and Dong work jointly on the budget and coordinate regarding instructor's salaries and housing allowance. In addition, MSU and LNU set out a mutual mission for creating the COIB in their agreement.

Second, common management evaluates common officers or boards of directors and individuals who manage both entities. *Id.* While LNU and MSU do not have common officers, members of their boards of directors, or management, the COIB arguable does. A reasonable jury could determine Robinette, an employee of MSU, and Dong, an employee of LNU, co-managed the COIB. They interacted regarding contract renewals and terms, promotions, and salaries. Robinette indicated he was informed regarding the functioning of the COIB and made recommendations regarding staffing decisions. While MSU contends its role was merely advisory, there is evidence, such as notifying Coutts of his promotion before getting Dong's approval, to indicate Robinette's role was more akin to that of a co-manager.

The third factor addresses the control of labor relations, such as policies, schedules, and salaries as well as hiring and firing decisions. *Id.* at *4. Employment and labor issues for COIB

8

were arguably handled by common management individuals, as discussed above. In addition, Robinette had authority to change or amend the faculty handbook given to instructors at the COIB, and could at least discuss and make recommendations regarding the COIB employees. The joint budget required MSU and LNU to coordinate regarding salaries and other benefits paid to COIB instructors. Further, MSU was responsible for curriculum and lesson plans for the instructors at the COIB, which would direct a substantial part of an instructor's daily work.

Finally, common ownership evaluates whether the two entities are owned by a common company or share officers and directors. *Id.* Neither party argues there is common ownership of the two universities. However, the facts indicate there may be common financial control over the COIB in that the budget was jointly prepared for the program and each university had input regarding that budget. The COIB's funds are derived from tuition from the joint program. Any profits from the program would then be divided by the two universities. The structure of the program essentially creates a separate entity which is controlled, and arguably commonly owned, by MSU and LNU.

MSU contends that it did not have control over Ma's employment because: (1) MSU did not supervise Ma's work or day-to-day activities; (2) LNU executed Ma's employment contract and paid Ma; (3) MSU and LNU are separate entities operating independently; (4) advice from MSU regarding Ma's termination does not establish joint employment; and (5) Ma claimed LNU was his employer during the litigation in China and should be estopped from claiming MSU is his employer.[3] Although these issues do not directly address the factors considered by the Eighth Circuit, the Court will briefly discuss these arguments in turn.

---

[3] MSU primarily relies on *Clinton's Ditch Co-op Co., Inc. v. N.L.R.B.*, 778 F.2d 132, 138-39 (2d Cir. 1985) (considering (1) hiring and firing; (2) discipline; (3) pay, insurance, and records; (4) supervision; and (5) participation in the collective bargaining process); and *Rivas v. Federacion de Asociaciones Pecuarias de Puerto Rico*, 929 F.2d 814, 820 (1st Cir. 1991) (considering "such factors as the supervision of the employees' day to day

9

MSU's interaction with LNU in running the COIB does not support MSU's contentions regarding supervision, contracts and payment, the separate nature of the universities, or the role of MSU in employment decisions. The control over curriculum, faculty handbooks, salaries and budgets, and employment decisions is such that a reasonable jury could determine MSU and LNU jointly operate the COIB and jointly employ its faculty. In addition, MSU's argument regarding estoppel is unpersuasive because Ma has consistently claimed he was employed by the COIB, a joint program between LNU and MSU. MSU has not put forth any evidence from the Chinese litigation that indicates Ma stated LNU was his only employer. As such, the Court cannot conclude he is estopped from bringing the claim. Moreover, his communication during the fall of 2009, which occurred before any litigation, indicates he viewed both universities as his employer.

The Court concludes a reasonable jury could find MSU and LNU were joint employers of the COIB instructors, like Ma. Therefore, summary judgment on this basis is inappropriate.

### C.    Race/National Origin Discrimination[4]

To avoid summary judgment on his Title VII race or national origin discrimination claim, Ma must either "present admissible evidence directly indicating unlawful discrimination" or demonstrate "an inference of unlawful discrimination under the burden-shifting framework

---

activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, and issuance of operating instructions") (quotation omitted). However, these cases do not outline the factors considered by the Eighth Circuit when considering whether two separate entities are joint employers. *See Davis v. Ricketts*, 2014 WL 4211355 (8th Cir. 2014).

[4] MSU's Motion to Strike argues Shepherd's statements to Ma are inadmissible hearsay because Shepherd was an employee of LNU or the COIB, not MSU, and as such, these statements would not be an opposing party's statement under Fed. R. Evid. 801(d)(2)(A). However, this argument is unpersuasive because it goes to the joint employer issue. If Ma prevails on his argument that LNU and MSU were his joint employers despite his employment contract with LNU only, the same argument would apply to Shepherd who worked under a similar employment contract. If Shepherd's joint employers were LNU and MSU his position as an employee and later a supervisor for both would allow his statements to be admissible under Fed. R. Evid. 801(d)(2)(D). Because a reasonable jury could find MSU and LNU were joint employers of faculty at the COIB, the Court has considered these statements for summary judgment purposes.

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (quotation omitted).

To establish a prima facie inference of unlawful discrimination, Ma must show: (1) he is a member of a protected class; (2) he met MSU's legitimate expectations; (3) he suffered an adverse employment action; and (4) the circumstances surrounding the action give rise to a reasonable inference of discrimination. *Id.* at 577. If Ma establishes his prima facie case, a presumption of race discrimination is created, and the burden shifts to MSU to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 577-78. If MSU meets this burden, the presumption of race discrimination is then rebutted, and Ma must prove MSU's reason for his termination is a pretext for discrimination. *Id.* at 578.

      i.      **Prima Facie Case**[5]

The parties do not dispute that Ma is member of a protected class and suffered an adverse employment action. Further, while MSU argues Ma cannot prove he met its legitimate expectations, it has not presented evidence to support that argument. Therefore, only the fourth element, the inference of discrimination, is at issue.

Ma argues the statements made by Shepherd regarding his and other employees' race or national origin create an inference of discrimination. Specifically, Robinette stated that the decision to terminate Ma's contract was based on the information and recommendation of Shepherd prior to his resignation on October 28, 2009. While the parties who carried out the termination made no comments indicating a discriminatory animus, the decision was based upon Shepherd's representations regarding Ma, not the representations or opinions of Coutts, Pederson, or Hamilton who formally terminated him. While MSU argues no discriminatory

---

[5] Ma may have shown direct evidence of unlawful discrimination. However, because the Court has determined there is an inference of discrimination under the burden shifting framework, it need not decide whether there is direct evidence of unlawful discrimination.

11

statements were made at the time of Ma's termination, it ignores the statements made when Shepherd voided his contract which resulted in Ma's pay being reduced and his housing allowance was eliminated in August. Further, these statements were made in close proximity to his termination on October 29, 2009, which tends to support Ma's assertion that the bias expressed actually motivated the decision to terminate him. *See Simmons v. Oce-USA, Inc.*, 174 F.3d 913, 916 (8th Cir. 1999) (noting that temporal proximity may help establish a causal link between comments and an adverse employment action); *Muor v. U.S. Bank Nat. Ass'n*, 716 F.3d 1072, 1077 (8th Cir. 2013) (same). Shepherd's statements could create an inference that Ma's race actually motivated Shepherd's decisions.

MSU argues any inference is undermined by the demographics and location of his employment, the fact that Ma was replaced by a person of Chinese and/or Asian ancestry, and the fact Robinette both hired Ma and terminated his employment. MSU first argues because the COIB staff and instructors were predominantly of Chinese ancestry, discrimination against Ma due to his own Chinese ancestry is unlikely. However, the program's location and general employee composition does not undermine Ma's argument that Shepherd demonstrated a discriminatory animus, and MSU has provided no case law to conclude otherwise. Further, while MSU's argument would be persuasive if all Ma's supervisors were of Chinese and/or Asian ancestry, it does not undermine the comments made by Shepherd, who is not of Chinese and/or Asian ancestry, and who provided the information upon which his termination was based.

Second, while the race or national origin of Ma's replacement is relevant to the inference of discrimination, it does not preclude such an inference. *See Walker v. St. Anthony's Med. Ctr.*, 881 F.2d 554, 558 (8th Cir. 1989) (analyzing sex discrimination and finding replacement by a member of the same class relevant, but not dispositive as to lack of discriminatory animus).

12

Even if Ma conceded Cheong's race or national origin as Chinese and/or Asian, the statements by Shepherd to Ma regarding his race, in conjunction with his other comments in the workplace, create an inference that race actually motivated Shepherd's decision. Further, Shepherd resigned the day before Ma's termination. Therefore, it is unlikely that he selected or assisted in the selection of Ma's replacement.

Finally, the facts do not support MSU's argument that Ma alleges Robinette both hired and fired him. Ma states he was recruited by Dr. Zhang, who was an MSU employee at the time. While Ma does allege Robinette's position gave him the authority to control employment decisions, Robinette took that position after Ma's relationship with the COIB had already been established. (Robinette Depo., Doc. 103-7.) Even if Ma's argument is that Robinette affirmatively approved his retention, it would not require the same scrutiny as hiring a new instructor. In addition, Ma does not claim Robinette had any actual bias. Rather, he contends Shepherd, who acted for the joint employers, was motivated by a discriminatory bias. It was during his first contract renewal under Shepherd's management that his employment situation deteriorated, which could indicate that Shepherd's bias motivated him to report Ma's alleged absences to Robinette.

### ii. Legitimate, Non-discriminatory Reason for Termination

The next step in the burden shifting analysis requires MSU to articulate a legitimate, non-discriminatory reason for Ma's termination in order to rebut the presumption of discrimination. MSU asserts Ma was terminated for repeated class absences, which would satisfy the requirement. *See Lovland v. Empl's Mut. Cas. Co.*, 674 F.3d 806, 813 (8th Cir. 2012) (citing excessive absences as a legitimate reason for termination in an FMLA case). However, Ma emphasizes that he has never been provided the exact dates of his absences, or any proof of the

13

days he was absent. (Ma Aff., Doc. 103-3; *see also* Doc. 103.) Further, Ma asserts the class was not properly set up until after the semester had begun. The emails between Shepherd and Ma seem to indicate there were issues regarding his class schedule. It is unclear from the evidence before the Court what date Ma was expected to start classes and when Ma actually started his classes.[6] Further, Shepherd's responsibility for any delay in registration of the classes is also unclear. The imprecise nature of MSU's assertion that Ma was absent for as many as eight classes tends to undermine the legitimacy of the reason for termination. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981) (holding "the defendant must clearly set forth" the legitimate, non-discriminatory reason).

### iii. Pretext

If the Court assumes MSU has clearly articulated a legitimate, non-discriminatory reason for Ma's termination, the burden then shifts back to Ma to establish the reason articulated is merely pretext. Ma can do so directly by demonstrating the discriminatory reason was the more likely motivator or indirectly by demonstrating the reason articulated is unworthy of credence. *Id.* at 256. Rejection of the defendant's proffered reason permits an inference of discrimination if plaintiff's evidence supports intentional discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

As discussed above, the lack of specific dates regarding Ma's absences tends to establish that the reason for Ma's termination is merely a pretext for discrimination. Further, Ma's assertions that his communication issues with Shepherd regarding when classes were to start and

---

[6] The Court agrees Ma cannot contradict his deposition testimony to create an issue of material fact. *See Fischer v. Andersen Corp.*, 483 F.3d 553, 558 (8th Cir. 2007). However, Ma is not contradicting his previous testimony. At most, he is clarifying his response by stating he was not absent once his schedule was set. While the semester may have started, Ma could not have been expected to begin teaching courses if his class times were not set. Any absences that occurred prior to Ma's schedule being set would have been unavoidable. Ma's testimony in his deposition is consistent with this position. (Doc. 65-3, p. 47-48.)

14

whether the classes were properly in the computer also tend to show that absenteeism was a pretext. This is particularly true when coupled with Shepherd's comments regarding Ma's race or national origin. The evidence offered by Ma is sufficient to create a prima facie case of race or national origin discrimination.

Thus, Ma has presented sufficient evidence to allow a reasonable fact finder to determine MSU was his joint employer. Further, Ma has a prima facie showing of race or national origin discrimination. Therefore, summary judgment is not proper.

### D. Tortious Interference

MSU asserts Ma's claim for tortious interference is barred because MSU is entitled to sovereign immunity. Ma concedes this argument and voluntarily dismisses Count II of his Second Amended Complaint. As such, dismissal of Count II is proper.

## IV. Conclusion

Accordingly, Defendants' Motion for Summary Judgment, (Doc. 64), is **DENIED**. Further, Count II of Plaintiff's Second Amended Complaint is hereby **DISMISSED**. Defendant's Motion to Strike Plaintiff's Statement of Additional Disputed or Undisputed Material Facts and/or Various Supporting Exhibits, (Doc. 109), is **DENIED**.

**IT IS SO ORDERED**.

/s/ Beth Phillips
BETH PHILLIPS, JUDGE
UNITED STATES DISTRICT COURT

DATE: September 3, 2014